UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| BARBARA A. ROMMEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:18-CV-67 PLC |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Barbara Rommel seeks review of the decision of Defendant Commissioner of Social Security Andrew Saul denying her application for Disability Insurance Benefits and Disabled Widow's Insurance Benefits under the Social Security Act. Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's applications.

**I.   Background and Procedural History**

In January 2015, Plaintiff, then fifty-four years old, filed her application for Disabled Widow's Insurance Benefits, and on April 2015, she filed an application for Disability Insurance Benefits alleging that she was disabled as of July 30, 2011 due to bipolar disorder, depression, and anxiety. (Tr. 52) The Social Security Administration ("SSA") denied the claim in September 2015, and Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ").

The SSA granted Plaintiff's request for review, and Plaintiff appeared and testified at a hearing before an ALJ on February 24, 2017. (Tr. 28-46) In a decision dated June 12, 2017, the

ALJ determined that Plaintiff "has not been under a disability, as defined in the Social Security Act, from July 30, 2011 through the date of this decision." (Tr. 23)

Plaintiff sought review of the ALJ's decision, and the SSA Appeals Council denied her request in January 2018. Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

**II.  Evidence before the ALJ**

    A. Testimony

Plaintiff testified that she was fifty-five years old, had an eleventh-grade education, and had suffered from mental illness since 1994. (Tr. 33-35) Plaintiff stated that she worked briefly as an in-home caregiver in 2011. (Tr. 37) As a caregiver, she regularly lifted twenty-five pounds or less, and her primary functions included cleaning, laundry, and cooking. Id. Prior to working as a caregiver, Plaintiff worked seven years at a bindery "more or less full time." (Tr. 35) According to her testimony, she was a "jack of all trades" where she "put books together" and delivered cases of paper. (Tr. 36-37)

Plaintiff testified that she suffered from anxiety and mood swings. (Tr. 39-41) Although she had seen a psychiatrist in the past, she was not receiving treatment from a mental health professional at the time of the hearing. (Tr. 39-40)

In regard to her psychological symptoms, Plaintiff described an incident at the bindery when, after receiving criticism from a supervisor, she "walked out" of the job and "cried all day." (Tr. 39) In response to the ALJ's question regarding her anxiety, Plaintiff responded: "…I just don't take things like I used to….[I]t's hard for me to work with some people and stuff. If I don't take the medicine that I'm on now – I mean, my son can even tell it when I don't take it." (Tr. 40) In regard to her mood swings, Plaintiff explained: "I'll be talking to my son or someone and I'll

be all right and then sometimes they'll say something and I'll just like that, go off on them or I'll get upset and walk away." (Tr. 42) Plaintiff stated that her medications did not cause side effects. (Tr. 41)

Plaintiff testified that, on a typical day, "I really stay at home and I clean my house, do the laundry, cook a meal." (Tr. 41-42) On nice days, Plaintiff would go outside "and mope around and do things, pick up little things and stuff." (Tr. 42) Plaintiff spent most of her time at home because her "vehicle has been broke [sic] down[.]" (Tr. 41) Plaintiff testified that she had not drunk alcohol in two or three years. (Tr. 42)

When the ALJ asked why she could not work as a night clerk at a hotel, Plaintiff responded, "I don't want to work at night. I don't want to work as being a clerk or any of that." (Tr. 41) Plaintiff stated she "tried working one time in a station thing and I didn't like it….that was the …first and the last night I worked there." (Id.) When the ALJ asked Plaintiff whether she could work in a hotel cleaning rooms by herself, Plaintiff said she would not want to work alone because there is "too much meanness going on in the world," but she was willing to work in housekeeping. Id.

A vocational expert testified that Plaintiff's previous work as a bindery machinery feeder was "unskilled" and "light," and that her previous work as personal attendant was "semi-skilled" and "light." (Tr. 44) The ALJ asked the vocational expert to consider a hypothetical individual with the same age, education, and past relevant work as Plaintiff, who was able to perform medium work with the following limitations:

> [C]an lift or carry fifty pounds occasionally and twenty-five pounds frequently. She can stand or walk for six hours in an eight-hour workday. She can sit for six hours in an eight-hour workday and she can push or pull in the limits for lifting and carrying. She can have occasional contact with coworkers, supervisors, and the general public. She should not work with the general public as a primary job duty.

> She should work in a socially isolated work environment and she should not do teamwork type of job duties.

(Tr. 44) The vocational expert responded that this hypothetical individual could perform Plaintiff's previous work as a bindery machine feeder as it was "generally performed," but not as "she described it." Id. The vocational expert stated that the hypothetical individual could also perform other "medium, unskilled" jobs available in the national or regional economy, such as a "boring machine tender," linen room attendant, or riveting machine operator. (Tr. 45)

### B. Relevant Medical Records

In August 2011, Plaintiff presented to psychiatrist Dr. Mogallapu for psychotherapy and medication management. (Tr. 280-87) Since her last appointment in April 2010, her husband's health had declined and he had been admitted to a nursing facility. (Tr. 283) Despite financial stressors, such as filing for bankruptcy and losing her house, Plaintiff stated that she was "hopeful about her future." (Tr. 283-84) Plaintiff reported that her "[a]nxiety is okay, when she takes her meds…so she has been taking her meds regularly." (Tr. 283) Upon examination, Plaintiff's mood was "okay," concentration was "good," affect was "euthymic, no overt distress or dysphoria," and she displayed no aggressive behavior. (Tr. 284) Plaintiff denied delusions, hallucinations, and suicidal thoughts, and she appeared to be alert and oriented with good concentration. (Tr. 284) Dr. Mogallapu assigned a Global Assessment Functioning (GAF) score of 55[1] and continued Plaintiff's citalopram, buspirone, and trazodone. (Tr. 284-85, 425)

---

[1] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" Pate-Fires v. Astrue, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (citing Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n 1994) (DSM–IV)). "The [GAF] score is a subjective determination that represents 'the clinician's judgment of the individual's overall level of functioning.'" Jones v. Astrue, 619 F.3d 963, 973-74 (8th Cir. 2010) (quotation omitted). "A GAF of 51 to 60 indicates the individual has '[m]oderate symptoms ... or moderate difficulty in social, occupational, or school functioning....'" Pate-Fires, 564 F.3d at 938 n. 3 (citing DSM–IV at 32).

When Plaintiff followed up with Dr. Mogallapu in December 2011, she reported "doing ok, besides the sleep problems and the fatigue at the end of the day." (Tr. 271) Plaintiff informed Dr. Mogallapu that "she drinks whiskey – about a couple of glasses every other night, after work. On the weekends, she might drink a pint," but "[i]t ain't that I got no alcohol problem[.]" (Id.) Plaintiff's mental status examination revealed normal mood and affect, good concentration, a GAF score of 55, and no delusions, hallucinations, suicidal ideation, or aggression. (Tr. 272) Dr. Mogallapu expressed concern that Plaintiff "might be minimizing the alcohol use" and recommended participation in AA and anxiety management groups. (Id.) Dr. Mogallapu prescribed mirtazapine, continued buspirone, tapered citalopram, and discontinued trazodone. (Tr. 273)

In January 2012, Plaintiff visited psychotherapist Dr. Senioria Brown. (Tr. 266-68) Plaintiff informed Dr. Brown that she had been unemployed since November 2011 and had been living alone since her husband moved to a long-term care facility three months earlier. (Tr. 266) She also stated that she enjoyed embroidering, sewing, and working outside. (Tr. 266) Plaintiff expressed concern about the level of care her husband was receiving at his facility and complained that the mirtazapine made her feel "more depressed after I wake up in the morning." (Tr. 268) Dr. Brown counseled Plaintiff on the hazards of consuming alcohol while on prescribed medication and referred her to vocational rehabilitation "for possible assessment for job training or job placement within her disability…." (Id.)

A few days later, Plaintiff returned to Dr. Mogallapu's office. (Tr. 259-264) Plaintiff reported: "I am doing better" because "I am not drinking like before." (Tr. 262) Plaintiff visited her husband every day, and she recently attended her daughter's baby shower. (Id.) Plaintiff informed Dr. Mogallapu that her sleep was "allright [sic], with trazodone," but she experienced

"irritability and stress related to current social stressors – esp. financial, housing, etc." (Id.) Upon examination, Dr. Mogallapu noted that Plaintiff's mood was "ok"; affect was "mood congruent, can be irritable on topics related to financial management"; and concentration was "fair." (Tr. 263) Dr. Mogallapu assigned Plaintiff a GAF score of 55, discontinued mirtazapine, started Sertraline, continued buspirone, and restarted trazodone. (Tr. 263)

When Plaintiff followed up with Dr. Mogallapu in February 2012, she reported that she was "doing okay" and her sleep "has actually been good lately." (Tr. 257) Plaintiff expressed happiness about the birth of her grandson and stated she had been helping her daughter, as well as visiting her husband in the nursing home. (Id.) Plaintiff reported that she had "several friends," one of whom accompanied Plaintiff to her appointment. (Id.) Plaintiff denied drinking any alcohol since her last appointment and stated she planned to "get[] back into the work force…though she is not sure when she might be trying to look for jobs." (Id.) Plaintiff's mood and affect were normal, concentration was good, and GAF was 55. (Tr. 258) Plaintiff declined referrals to individual therapy, stress/anxiety and mood management groups, and a weight management program. (Tr. 259) Dr. Mogallapu continued Plaintiff's medication and recommended a follow-up appointment in three months.[2] Id.

Between October 2012 and December 2013, Plaintiff's gynecologist, Dr. Patty, managed Plaintiff's mental health medications. (Tr. 303-16) In October 2012, Dr. Patty prescribed, among other medications, buspirone, Zoloft, Xanax. (Tr. 316) In April 2013, Dr. Patty refilled Plaintiff's Xanax. (Tr. 314) In November 2013, Plaintiff informed Dr. Patty that she was experiencing mood

---

[2] There is no record Plaintiff followed up with Dr. Mogallapu as recommended.

6

swings and was "on the edge." (Tr. 311) He noted that Plaintiff was taking Buspar, Zoloft, and Xanax, and he diagnosed her with anxiety, depression, and menopause.[3] (Tr. 312)

In June 2015, Dr. Rosenboom performed a psychological consultative examination of Plaintiff at the request of Disability Determination Services.[4] (Tr. 333-37) Plaintiff informed Dr. Rosenboom that she had bipolar disorder and was taking Zoloft, Buspar, and Xanax. (Tr. 333) Describing her symptoms, Plaintiff stated: "I can be all right and then I change and get angry, mad, feel miserable, and I can get to the point that I don't care anymore." (Id.) When Dr. Rosenboom asked Plaintiff about her depression, she stated: "I sit and cry and feel miserable. I don't rest good at night and I can wake up at 2 o'clock or 3 o'clock in the morning and just sit there." (Tr. 334) In regard to her anxiety, Plaintiff stated: "…I just get overwhelmed with things and I get tired and go to sleep." (Id.) Plaintiff elaborated that she angered easily and stated: "I don't like being around people, I don't trust them. I just don't like how they act. I have always ended up getting hurt after I'm nice to people." (Id.) Plaintiff informed Dr. Rosenboom that she drank "every once in a while" and characterized her alcohol consumption as "rare." (Id.)

Regarding her current psychological stressors, Plaintiff stated, "I've got a lot of bills that need to be paid…I don't have enough money for me." (Tr. 334) Plaintiff denied any inpatient psychiatric treatment or emergency mental health treatment. (Tr. 334) She reported going to a VA medical center for psychiatric treatment but did not specify why she stopped treatment. Id. Plaintiff also stated that she had been taking psychotropic medication consistently since 1994, which

---

[3] Plaintiff informed Dr. Rosenboom that, after November 2013, her primary care physician managed her prescriptions. (Tr. 333) The primary care physician's treatment notes do not appear in the record.

[4] Dr. Rosenboom reviewed medical records from Plaintiff's psychiatric appointments in January and February 2012 and her gynecologist appointment of November 2013. (Tr. 328)

7

"helped her mental disorders symptoms but she has not achieved a complete remission of her symptoms that has lasted six months or more." (Id.)

In discussing her work history, Plaintiff stated she left her job at the printing company in 2014 to care for her husband. (Tr. 335) She denied general problems with authority figures or having ever been fired from a job. (Id.) When Dr. Rosenboom asked Plaintiff why she had not worked since the death of her husband, Plaintiff answered: "I'm not up to it. I just don't want to be around people." (Id.)

Upon examination, Dr. Rosenboom observed that Plaintiff was "irritable," "curt," and "snippy," and he noted that Plaintiff occasionally displayed a hostile facial expression during the interview. (Tr. 336) She demonstrated adequate and appropriate eye contact with Dr. Rosenboom, a normal appearance, normal motor activity, good articulation, spontaneous thought, perfect orientation, normal memory, and normal concentration. (Id.) Dr. Rosenboom administered two screening instruments, the results of which placed Plaintiff in "the severe range of anxiety" and the "mild/moderate range of depressive symptoms." (Id.)

Dr. Rosenboom diagnosed Plaintiff with "generalized anxiety disorder, severe" and "depressive disorder, NOS, mild/moderate" and assigned a GAF score of 50. (Tr. 336-37) He opined that Plaintiff's "ability to understand, remember, and carry out complex instructions is not impaired by her mental disorder symptoms." (Tr. 337) (emphasis original) However, her "ability to respond appropriately to work supervisors, co-workers and work stressors is markedly impaired by her mental disorder symptoms." (Id.) (emphasis original)

In August 2015, Dr. Smith, a state-agency non-examining doctor reviewed Plaintiff's medical records, including Dr. Rosenboom's evaluation, and completed a psychiatric review technique. (Tr. 51-53) Dr. Smith opined that Plaintiff had: no restrictions on activities of daily

living; moderate difficulties in maintaining social functioning; and mild difficulties in maintain concentration, persistence, or pace. (Tr. 52) In regard to Plaintiff's activities of daily living, Dr. Smith wrote that Plaintiff cared for pets, completed "usual household activities," drove, went "out alone," engaged in fishing and needlework, spent time with family, played cards with a friend, and took medication and went places without reminders. (Id.) Dr. Smith concluded that Plaintiff: "has difficulty with social interaction, however [she] would be capable of working in an environment which does not require close or frequent contacts with the public or coworkers or in which she is able to work independently[.]" (Id.)

### III. ALJ Decision

In a decision issued on June 12, 2017, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from July 30, 2011 to the date of his decision. (Tr. 23) The ALJ applied the five-step evaluation set forth in 20 C.F.R. § 404.1520 and found that Plaintiff: (1) had not engaged in substantial gainful activity since July 30, 2011, the application date; (2) had the severe impairments of affective disorder, anxiety disorder, and substance abuse; and (3) did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 15) In finding that Plaintiff's mental impairments did not meet the criteria of Listings 12.04 or 12.06, the ALJ determined that Plaintiff had: no limitations on understanding, remembering, and applying information; moderate limitations on interacting with others; mild limitations on concentrating, persisting, and maintaining pace; and no limitations on adopting or managing herself. (Tr. 15-16)

The ALJ discussed Plaintiff's medical records and found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 20) The ALJ determined Plaintiff had the RFC to perform a reduced range of medium work with the following limitations:

> [S]he can lift or carry 50 pounds occasionally and 25 pounds frequently. She can stand or walk for 6 hours in an 8-hour workday. She can sit for 6 hours in an 8-hour workday. She can push or pull within limits for lifting and carrying. She can have occasional contact with coworkers, supervisors, and the general public. She should not work with the general public as a primary job duty. She should work in a socially isolated work environment, and she should not do teamwork types of job duties.

(Tr. 17)

Based on the vocational expert's testimony, the ALJ found that Plaintiff was capable of performing her past relevant work as a bindery machinery feeder/off bearer. (Tr. 21) The ALJ further found that other jobs existed in the national economy that Plaintiff was able to perform, including boring machine tender, riveting machine operator, and linen room attendant. (Tr. 21-22) Therefore, the ALJ concluded that Plaintiff had "not been under a disability, as defined in the Social Security Act, from July 30, 2011 through the date of this decision[.]" (Tr. 23)

## IV. Discussion

Plaintiff claims that substantial evidence did not support the ALJ's decision because the ALJ failed to properly: (1) evaluate the consulting psychologist's opinion when determining Plaintiff's RFC and (2) consider Plaintiff's subjective reports. [ECF No. 13] Defendant counters that: (1) Dr. Rosenboom's opinion that Plaintiff had marked limitations in interacting with others was inconsistent with the longitudinal record; (2) the ALJ relied on some medical evidence to formulate Plaintiff's RFC; and (3) the ALJ properly analyzed the consistency of Plaintiff's subjective statements. [ECF No. 20]

### A. Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)) The Court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence supporting a contrary outcome." Id. (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)).

The Court does not "reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a Court must affirm the ALJ's decision "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings." Cruze v. Charter, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)); Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

### B. Dr. Rosenboom's Medical Opinion

Plaintiff argues that the ALJ failed to properly evaluate the medical opinion of Dr. Rosenboom, the non-treating consulting psychologist, when determining Plaintiff's RFC. More specifically, Plaintiff claims that the ALJ did not provide sufficient support for dismissing the marked limitations in social functioning identified by Dr. Rosenboom. In response, Defendant

11

asserts that the ALJ properly considered Dr. Rosenboom's medical opinion and provided good reasons for the weight he assigned it.

In determining a claimant's RFC, the ALJ is required to consider the medical opinion evidence of record together with the other relevant evidence. 20 C.F.R. § 404.1527(b). The ALJ must "give good reasons" to explain the weight given to every medical opinion of record, regardless of its source. See 20 C.F.R. §§ 404.1527(c), (e)(2)(ii), 416.927(c), (e)(2)(ii). All medical opinions, whether by treating or consultative examiners, are weighed based on (1) whether the provider examined the claimant; (2) whether the provider is a treating source; (3) length of treatment relationship and frequency of examination, including nature and extent of the treatment relationship; (4) supportability of opinion with medical signs, laboratory findings, and explanations; (5) consistency with the record as a whole; (6) specialization; and (7) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

Dr. Rosenboom performed a consultative psychological examination of Plaintiff and found that Plaintiff's ability to respond appropriately to supervisors, co-workers, and work stressors was markedly impaired. (Tr. 337) He also opined that Plaintiff's ability to understand, remember, and carry out complex instructions was unimpaired. Id.

The ALJ assigned "some weight" to Dr. Rosenboom's opinions. (Tr. 20) The ALJ credited Dr. Rosenboom's opinion as to Plaintiff's ability to understand, remember, and carry out complex instructions, because it was consistent with the record as a whole. Id. However, the ALJ rejected Dr. Rosenboom's finding that Plaintiff was markedly impaired in her ability to interact with others, because it was inconsistent with the treatment records and Plaintiff's testimony. Id. The ALJ explained: "[T]he evidence at the hearing level, including the claimant's subsequent VA mental health treatment records and testimony at the hearing, shows that the claimant is not markedly

12

impaired in her social functioning. The evidence at the hearing level shows that she can have occasional contact with coworkers, supervisors, and the general public." (Tr. 20)

The ALJ rejected Dr. Rosenboom's finding that Plaintiff was markedly impaired in her ability to interact with others because it was inconsistent with Dr. Mogallapu's treatment records. In August and December 2011, Plaintiff's psychiatrist, Dr. Mogallapu, observed that Plaintiff's mood and affect were "okay" or "good." In January 2012, Plaintiff was "doing better." Although Dr. Mogallapu observed that Plaintiff was irritable, Plaintiff reported attending her daughter's baby shower the previous day and visiting her husband daily at the long-term care facility. In February 2012, Plaintiff brought a friend to her appointment with Dr. Mogallapu, expressed happiness about the birth of her grandson, and stated that she had "several friends." Plaintiff informed Dr. Mogallapu that she was helping care for her grandson and continued visiting her husband at the care facility. Dr. Mogallapu consistently rated Plaintiff's GAF at 55, which signifies moderate symptoms. After February 2012, other medical providers managed Plaintiff's medication and she received no further mental health treatment. "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2009) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Plaintiff's testimony and function report also contradicted Dr. Rosenboom's finding that Plaintiff's social functioning was markedly impaired. As the ALJ emphasized in his decision, Plaintiff "admitted in her testimony that she could work at a job cleaning hotel rooms if she did not have to work alone and could work with someone else." (Tr. 21) Additionally, Plaintiff had "never been fired or laid off from a job because of problems getting along with other people." (Tr. 16) Finally, Plaintiff lived with her son and reported that she spent time with others, including her

13

grandchildren, talked on the telephone, and played cards with a friend "about once a week at her home." (Tr. 172) The ALJ found the above activities required Plaintiff to interact with others beyond a marked level. See Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005) (an ALJ may properly consider evidence of daily activities when discounting a physician's opinion.)

Furthermore, despite discounting Dr. Rosenboom's opinion that her ability to interact with others was markedly impaired, the ALJ included significant social-functioning limitations in the RFC. Specifically, the ALJ limited Plaintiff to "occasional contact with coworkers, supervisors, and the general public" and stated that Plaintiff's primary job duties should not involve teamwork or "work with the general public." Additionally, the ALJ stated that Plaintiff "should work in a socially isolated work environment." Based on the above, the Court finds that the ALJ did not err in assigning Dr. Rosenboom's opinion "some weight."

The ALJ also discredited Dr. Rosenboom's opinion because he "did not seem to be aware of the full extent of the claimant's history of alcohol abuse." (Tr. 20) According to Plaintiff, the ALJ improperly "used [Plaintiff's] history of alcohol abuse as a reason for discounting the severity of her mental health impairments" and violated the requirements of Brueggemann v. Barnhart, 348 F.3d 689 (8th Cir. 2003). [ECF No. 13 at 6]

In Brueggemann, the Eighth Circuit outlined a three-step process for determining whether substance use is material to disability. Id. at 694-95. Because the ALJ found that Plaintiff was not disabled, even with the severe impairment of substance abuse, it was not necessary to determine whether her alcohol use was a material factor contributing to any disability. See Turhan E.W. v. Berryhill, 1:18-CV-45 JMB, 2019 WL 1452935, at *9 n. 11 (E.D. Mo. Apr. 2, 2019)

Upon review of the records and the ALJ's decision, the Court finds that the ALJ evaluated all of the evidence of record and provided "good reasons" for the weight he accorded Dr. Rosenboom's opinion. Because substantial evidence on the record supports the ALJ's decision to assign weight to some portions and discount other portions of Dr. Rosenboom's opinion, the Court will not disturb that determination.[5]

C. Plaintiff's Subjective Allegations

Plaintiff claims that substantial evidence did not support the ALJ's decision because he failed to properly evaluate Plaintiff's subjective allegations. [ECF No. 13] More specifically, Plaintiff states: "Remand is required because the ALJ's determination relied on a mistaken classification of the record, overlooked relevant evidence, and did not address factors that bolstered [Plaintiff's] allegations." [Id. at 10] Defendant counters that the ALJ properly considered the record as a whole and determined that Plaintiff's subjective complaints were inconsistent with the record. [ECF No. 20]

Before determining a claimant's RFC, the ALJ evaluates the credibility of the claimant's subjective complaints.[6] Wagner, 499 F.3d at 851 (citing Pearsall, 274 F.3d at 1218). In evaluating

---

[5] Citing Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001), Plaintiff argues that "the ALJ did not have substantial evidence to support his conclusion that [Plaintiff] could have occasional contact with coworkers, supervisors, and the general public." [ECF No. 13 at 8] In Lauer, the Eighth Circuit reversed the denial of benefits because the record contained no medical evidence to support the ALJ's assessment of the degree to which the plaintiff's mental impairments affected his RFC. Id. at 706. The instant case is distinguishable because the results of Plaintiff's mental status examinations and Dr. Smith's medical opinion supported the ALJ's RFC determination.

[6] "For decisions made on or after March 28, 2016, Social Security Ruling 16-3p eliminates the term 'credibility' from the analysis of subjective complaints, clarifying that 'subjective symptom evaluation is not an examination of an individual's character.'" Crystal M.M. v. Berryhill, 1:18 CV 194 JMB, 2019 WL 2410862, at *15 (E.D. Mo. June 7, 2019) (citing SSR 16-3p, 2017 WL 5180304, at *2 (Soc. Sec. Admin. Oct. 25, 2017)). The factors to be considered in evaluating a claimant's statements, however, remain the same. See id. (citing SSR 16-3p); see also 20 C.F.R. §§ 404.1529, 416.929.

15

a claimant's subjective allegations, the ALJ considers the factors set forth in Polaski: the claimant's daily activities; the duration, frequency, and intensity of pain; the dosage, effectiveness, and side effects of medication; any precipitating and aggravating factors; any functional restrictions; the claimant's work history; and the absence of objective medical evidence to support the claimant's complaint. Polaski v. Heckler, 751 F.2d 943, 948 (8th Cir. 1984); see also 20 C.F.R § 404.1529; SSR 16-3p.

"The ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole." Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (internal citations and quotations omitted). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Smith v. Colvin, 756 F.3d 621, 625 (8th Cir. 2014).

Here, the ALJ found that, while Plaintiff's mental impairments caused functional limitations, "nothing in this record shows that Plaintiff cannot perform work within the limitations set forth in the RFC." (Tr. 21) The ALJ noted that the "testimony and written statements are marked by some inconsistencies regarding her symptoms and impairments," and her "subjective allegations are inconsistent with her extensive daily activities." (Tr. 20-21) Additionally, "the record does not document objective findings or treatment reasonably consistent with the extreme symptoms and limitations the claimant alleges." (Tr. 21)

First, the ALJ found that Plaintiff's reported activities of daily living suggested that her mental impairments were less limiting than she alleged. Specifically, the ALJ noted that Plaintiff admitted the abilities to: perform personal care tasks; feed and water her two dogs; prepare meals; do household chores, including vacuuming, sweeping, dusting, dishes, cleaning toilets, and mowing the lawn; drive a car; and shop. (Tr. 15) Plaintiff also attended family events, such as her

16

daughter's baby shower, and spent time with her children and grandchildren, as well as a few good friends. The ALJ concluded that this evidence demonstrated that Plaintiff was "for the most part, capable of interacting independently, appropriately, and effectively on a sustained basis, but that she would have some limitations in interacting and relating with coworkers, supervisors, and the general public."[7] (Tr. 16) See Julin v. Colvin, 826 F.3d 1082, 1087 (8th Cir. 2016) (claimant's ability to prepare meals, read, play internet games, shop, clean houses, and visit family and friends showed she was "capable of….interacting with others on at least a superficial level"); Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) ("acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.").

Second, after thoroughly reviewing the entire record, the ALJ identified several inconsistencies between Plaintiff's treatment history and her subjective allegations.[8] (Tr. 17-21) For example, the ALJ noted that Plaintiff's clinical findings consistently revealed normal results for her mood, affect, gross motor activity, speech, understanding, orientation, and thought processes. (Tr. 258, 263, 272, 284, 336) These consistently normal clinical findings undermined Plaintiff's allegations of disabling symptoms. See Constable v. Colvin, No. 4:14 CV 1128 CDP, 2015 WL 5734977, at *18 (E.D. Mo. Sept. 29, 2015) (ALJ properly discounted plaintiff's

---

[7] Plaintiff asserts that the ALJ failed to consider the "quality" and the frequency of Plaintiff's daily activities and therefore overstated Plaintiff's ability to perform those acts. [ECF No. 13 at 13-14 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007) (the ALJ should consider the quality of the daily activities, the frequency, as well as the ability to sustain them over a period of time)] This is not ground for reversal, however, because the record contained, and the ALJ documented, several other factors undermining Plaintiff's subjective allegations. See Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008).

[8] Plaintiff argues that the ALJ failed to properly consider the entire record and instead focused only on "a few instances of treatment records." [ECF No. 13 at 4-5] However, the ALJ discussed all the records including the medical opinions and treatment notes that he considered in reaching the RFC. (Tr. 17-21); See Willcockson v. Astrue, 540 F.3d 878, 879-80 (8th Cir. 2008) (the ALJ is not required to discuss every medical record in detail so long as he properly considers the record).

17

subjective allegation because many of her mental-status examination yielded no significant results).

The ALJ observed other inconsistencies that cast doubt on Plaintiff's subjective claims that her mental impairments were disabling. (Tr. 18) For example, in January 2012, a psychotherapist referred Plaintiff to vocational rehabilitation for either job retraining or job placement assessment, which suggested an ability to work. (Tr. 19) Plaintiff conceded at the hearing that she could perform certain types of work and did not "want to" perform other types of work. (Tr. 21, 41) In February 2012, Plaintiff told Dr. Mogallapu that she planned to reenter the workforce and would be looking for jobs similar to her prior position "when she decides to work." (Tr. 257, 397) Finally, Plaintiff resumed working in August 2014 and quit to take care of her husband, not because of her mental health issues. (Tr. 19, 146, 156, 335); See Goff, 421 F.3d at 793 ("Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition.").

Additionally, the ALJ found that Plaintiff's "conservative treatment history" undermined her subjective claims regarding the limiting effects of her impairment. (Tr. 21) The ALJ noted that Plaintiff discontinued psychiatric treatment with Dr. Mogallapu in February 2012 and, thereafter, relied on her gynecologist and her primary care physician to manage her psychotropic medications. See Casey v. Astrue, 503 F.3d 687, 693 (8th Cir. 2007) (failure to seek regular medical treatment is inconsistent with plaintiff's allegation of disabling pain). A record of conservative treatment is a proper consideration when discrediting a claimant's subjective complaints of pain. See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). The ALJ also noted that Plaintiff repeatedly declined individual and group therapy. See Partee v. Astrue, 638 F.3d 860, 864 (8th Cir. 2011) (holding that failure to seek mental treatment is a relevant consideration when evaluating a claimant's mental impairment).

Finally, the ALJ considered the fact that Plaintiff had significant gaps in her mental health treatment. For example, Plaintiff attended four treatment sessions with Dr. Mogallapu between July 2011 and February 2012, but eight months elapsed between Plaintiff's February 2012 appointment and her next doctor appointment on October 2012. At the time of the hearing in February 2017, Plaintiff was not receiving mental health treatment. See Rice v. Astrue, No. 4:11-CV-1961 CEJ, 2013 WL 275584, at *12 (E.D. Mo. Jan. 24, 2013) (significant gaps in plaintiff's treatment for depression cast doubt on her allegation of disabling symptoms).

Based on the above, the Court finds that substantial evidence supported the ALJ's determination that Plaintiff's subjective allegation were not entirely credible. Because the ALJ provided "good reasons" for discrediting Plaintiff's subjective allegations, the Court defers to the ALJ's credibility determination. See Julin, 826 F.3d at 1086.

## V. Conclusion

For the reasons discussed above, the undersigned finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying Social Security benefits be **AFFIRMED**.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of September, 2019